NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| KAMERON TEEL, | |
| Plaintiff, | |
| v. | Civil No. 17-02253 (RBK/AMD) |
| SERGEANT ELIASEN, BOROUGH OF GLASSBORO, *et al*, | **OPINION** |
| Defendants. | |

**KUGLER**, United States District Judge:

**THIS MATTER** comes before the Court upon the Summary Judgment Motion (Doc. No. 44) of the Borough of Glassboro, Chief Alex Fanfarillo of the Glassboro Police Department ("GPD"), Sergeant Daniel Eliasen of the GPD, Lieutenant Robert Highly of the GPD, and Officer Dominic Visceglia of the GPD (Collectively "Defendants"). This Motion seeks to dismiss Count VI (Failure to Intervene) of Plaintiff Kameron Teel's Amended Complaint (Doc. No. 21). Count VI alleges that Defendants Eliasen and Visceglia "violated Mr. Teel's rights when they failed to stop each other from exerting excessive force and fail[ed] to intervene and stop the civil rights violations. . ." Am. Compl. at ¶ 86. The Motion turns largely on one question: did Defendants Eliasen and Visceglia act reasonably? Because material facts in dispute bear on that question, Defendants' Motion is **DENIED**.

I.   BACKGROUND

Plaintiff Kameron Teel is a five-foot-ten, twenty-five-year-old African American male and an accomplished athlete. Pl. Statement of Material Fact ("P. SMOF") [Doc. No. 52] ¶¶ 1–4.[1] In 2016, he trained avidly as a martial artist. He won both the state championship for Judo and, at the time of his deposition, seventy-five consecutive bouts. He also hoped to enter a police academy in Philadelphia.

On June 24, 2016, Plaintiff rode his bicycle to New Street Park ("Park") for an evening workout. New Street Park had closed at sunset, but Plaintiff entered anyway around 8pm. That evening, Plaintiff donned dark athletic clothes and wore headphones. P. SOMF at ¶¶ 15–17. He biked a mile or so and then engaged in various exercises on playground equipment. At the time he entered the park it was classified as a high-crime area by the GPD. Defs.' St. of Mat. Facts ("SOMF") [Doc. No. 44-2] ¶ 11. In 2016 alone, GPD received more than two thousand calls from the Park's two neighboring apartment complexes. *Id.*

The Glassboro Police Department ("GPD") received a report that a woman was missing from from a nearby group home that same evening. GPD Sergeant Daniel Eliasen and Officer Dominic Visceglia (collectively "Defendants") entered New Street Park. When Sergeant Eliasen first entered on foot to look for the missing woman, he observed someone approximately 50-100 feet away. This person, later determined to be Plaintiff Kameron Teel, had climbed on top of the

---

[1] The Court notes that Plaintiff has failed to comply with Local Rule 56.1(a) ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement . . .") There is no specific, paragraph-by-paragraph reference to Defendants' statements of material fact that admit or deny each fact. The Court has therefore been left to comb through the record, focusing on the sworn testimony of the parties involved.

playground equipment to engage in various workout activities. After seeing Plaintiff use what appeared to be a lighter, Sergeant Eliasen decided to investigate whether the trespasser was using illegal drugs. Sergeant Eliasen then radioed Officer Visceglia, who along with his K-9 "Charlie," entered the Park in a marked police vehicle and shined a light on the individual. The suspect, now on his bicycle, stopped and put his hands up. Both officers communicated directions for him to get down on the ground and keep his hands out.

While the parties dispute the events that occurred, their body-worn cameras show that the two police officers used some force in the arrest. Defs. Br., Ex. K ("Body Worn Camera"). Specifically, during the arrest Sergeant Eliasen attempted to grab and control Plaintiff and used OC Spray to subdue him. In addition, Officer Visceglia assisted Eliasen in the arrest and brought his K-9 "Charlie" to the scene. While in handcuffs, Plaintiff suffered a concussion from two contacts with a squad car. During the first contact, Officer Eliasen was responsible for guiding Plaintiff to the car. During the second contact, Officer Visceglia assisted Eliasen in guiding Plaintiff to the car. Ultimately, the parties debate whether the use of force was necessary and how the events unfolded. The Court therefore provides an overview of each party's account based on the sworn testimony submitted to the Court.

1. Plaintiff's Account

Plaintiff entered New Street Park between 8 and 9 pm to bike the two-mile park loop and do various exercises on playground equipment. Plaintiff admits that the Park was closed at the time he entered. Def. Deposition ("Teel Dep.") [Doc. No. 44-5], 63. During his workout, he listened to music on his cell phone, which lights up when turned on. *Id.* at 67.

Plaintiff claims that he heard sirens but initially believed they were in the distance. *Id.* at 70. Plaintiff then got back on his bike to ride in the opposite direction from which entered. Plaintiff heard a police officer, Sergeant Eliasen, as he approached the exit. A second officer, Officer Visceglia, shined a light on him and said, "Get on the ground, canine police." *Id.* at 67. Plaintiff admits this directive was "loud and clear." *Id.* at 72.

Plaintiff is terrified of dogs and claims Officer Visceglia's K-9 barked aggressively at him. Plaintiff put his hands up even though the officers did not inform him why he was stopped. Plaintiff then laid flat on the ground like he was "doing a push up." *Id*. at 60. Plaintiff insists that he complied with the Officers' commands, but admits it may have taken him a "split second" because of the shock of the K-9's barking. Plaintiff stated that "the dog looked like it was about to come off the leash," and Officer Visceglia "used force" to stop the dog from attacking. *Id*. at 78. Plaintiff explained that he feared for his life.

Plaintiff admits that he did not fully comply with the Officers' orders. For example, while his stomach remained flat on the ground, he lifted his chest off the ground. He likened the movement to a yoga position called "a cobra position" — where his stomach was flat on the ground, but he lifted his chest up. *Id.* at 79. At this point, the Officers said, "stop resisting, stop resisting." *Id.* at 60. Plaintiff insists he did not resist.

Plaintiff asserts that the Officers used force in arresting him. For example, he testified that Eliasen "came over and flipped me towards my back, put his knee on my chest, and hands toward my throat." *Id.* at 83. Officer Visceglia also told him that K-9 Charlie is "going to bite you" for resisting. *Id*. at 61. Sergeant Eliasen then sprayed Plaintiff with OC Spray. And for thirty seconds or so, Sergeant Eliasen remained on top of him as Plaintiff screamed in fear of his life. *Id.* at 101. Sergeant Eliasen then handcuffed Plaintiff and took him toward the police car.

Plaintiff then asked if Eliasen's body worn camera recorded the incident. Plaintiff claims one of the Officers "slammed [him] down on the hood of the vehicle" and once again before putting him in the back seat of the police car. *Id.* at 120. He suffered a concussion. *Id.* at 114.

Plaintiff later filed a complaint with the Internal Affairs Department of the GPD. While he signed this complaint, he admits that he did not personally file it. *Id*. at 185. Plaintiff explained that the Officers targeted him because of his race. "[T]hey saw a black man and acted accordingly. . ." *Id*. at 188.

2. **Sergeant Eliasen's Account**

On June 24, 2016, GPD had only four officers on active duty. Eliasen Deposition ("Eliasen Dep.") [Doc. No. 44-6], 31. Daniel Eliasen, a Sergeant with twenty-two years on the force, supervised these officers. That day, GPD received reports of a runaway female. A fellow GPD Patrolman located her with some other individuals near the Park and Park Crest Village Apartments ("Village Apartments"). Sergeant Eliasen sent one GCP officer to take an initial report at the group home. *Id.* at 31. He then traveled to the Park to look for her.

Sergeant Eliasen entered the closed Park shortly after sunset. Eliasen believed the female may have entered through one of the many holes in the fence. Now on foot, he "decided a stealthy approach would be advantageous." GPD Incident Report [Doc. No. 44-13]. He then observed a shadowy figure between fifty and one-hundred feet away. Eliasen Dep. at 24. The figure appeared to be a person riding a bike. The person rode toward Eliasen but "veer[ed] toward a little kid's play set. . ." *Id*. at 24.

Sergeant Eliasen found this activity highly suspicious and decided to investigate. He felt there was no legitimate reason for someone to be by "a little kids' playset [] at nighttime" in a

closed park. *Id.* at 30. He then noticed a light flicker from the top of the children's play set. *Id.* at 26. He believed that the light was coming from a flame, indicating illegal drug use. *Id.* at 38, 40. He first called Officer Visceglia, one of two officers who could have responded. Officer Visceglia approached the Park from another entrance in his marked police car. *Id.* at 30. As Visceglia entered the Park, Eliasen activated his body worn camera. Eliasen then instructed Visceglia to shine a spotlight from his car on the play area in question. *Id.* at 45.

Eliasen then observed movement. *Id.* at 50. He saw the person "trying to make it towards the back of the park." *Id.* The person was "now trying to get away or evade or avoid being seen by that marked police car." *Id.* at 53. The now-suspect headed toward Eliasen. Eliasen then decided to make his presence known for the first time. *Id.* He turned on his flashlight, shined it at the suspect, and gave loud, verbal commands. He said, "Police. Get off the bike." *Id.* at 50. Initially, the suspect got off the bike and put his hands up. *Id.* at 57. The suspect then "got back up again." *Id.* at 59.

Eliasen then ordered the suspect to the ground and saw him reach inside his belt. *Id.* at 60. Eliasen approached and attempted to physically engage the moving suspect. The minute he touched the man's hand, the suspect pulled Eliasen, who was only 5'6", to the ground. *Id.* at 61. A physical struggle ensued. Eliasen remained physically on top of the suspect, who was now face down on the ground. Eliasen then put his hands on the base of the man's chest and neck to "gain control." *Id.* at 70. While the man did not strike Eliasen or go for his weapon, the two engaged in a physical struggle on the ground for nearly five minutes. *Id.* at 66. Eliasen's radio became dislodged and he "got knocked around a little bit." *Id.* at 64–68. Eliasen, still on top of the man, then grabbed the front of his chest, turned him around, and sprayed him with OC Spray.

Eliasen handcuffed the suspect, Plaintiff Kameron Teel, and prepared to bring him in. He guided Teel, who was hand-cuffed, to Officer Visceglia's patrol car, the closest "rally point." On the way to the car, Teel screamed at the officers and claimed mistreatment. *Id.* at 91. Teel then turned toward Eliasen and asked whether his body worn camera was recording. *Id.* Eliasen explained, "You're being audio and video recorded." *Id.* at 92. Teel then inexplicably "threw and lunged himself on the hood of that police car." *Id.* at 92. The impact caused a dent in Officer Visceglia's police car. *Id.* Eliasen ordered Teel to stop trying to hurt himself. Teel was then placed in the squad car and taken to the GPD.

### 3. Officer Dominic Visceglia's Account

Officer Dominic Visceglia responded to a radio call from Sergeant Eliasen during the night in question. Visceglia Deposition ("Visceglia Dep.") [Doc. No. 44-7], 29. Visceglia, a six-year veteran of the GPD, was not in the Park, but rather was nearby in a marked K-9 police car. *Id.* The call did not identify the subject by name or race. *Id.* at 30. Instead, Eliasen instructed Visceglia that there was "a subject in the park. He's in the area of the playground. Just pull in through the main entrance." *Id.* With the gate closed, Officer Visceglia drove over the curb to get closer to the playground. *Id.* at 31. He drove to a spot between 75 and 100 feet from the individual, parked, and used his spotlight to illuminate the area. *Id.* at 31, 33, 56.

Officer Visceglia saw the individual and exited his vehicle with K-9 Charlie. He then saw and heard Sergeant Eliasen addressing the suspect. *Id.* at 33. Sergeant Eliasen directed the individual to get on the ground numerous times. *Id.* at 154. As Visceglia and Charlie started closing in, the suspect got up and took a couple steps back. *Id.* at 60. The suspect engaged in "passive resistance" and pulled his arms away from Sergeant Eliasen. *Id.* at 59. The suspect also did not comply with Eliasen's command to get on the ground. *Id.* at 61. As a result, Officer

Visceglia gave loud commands. He also warned that if the suspect did not stop resisting arrest, K-9 Charlie would bite him. *Id.* at 59. Officer Eliasen, still on top of the suspect, sprayed OC Spray in order to gain control and put the suspect in handcuffs. *Id.* at 162.

The suspect was then arrested. Visceglia heard him say at least five times that he could not breathe. *Id.* at 161. None of these statements were made prior to Eliasen's use of OC Spray. As Officer Eliasen took the suspect to Visceglia's squad car, he asked whether he was being recorded on a body worn camera. *Id.* at 163. After Eliasen said he was, the suspect "threw himself into the police vehicle." *Id.* at 162. Visceglia then came back around the car to assist Eliasen in helping the suspect stand upright and ordering him to stop. *Id.* Again, the suspect threw his head into the vehicle. *Id.* at 163.

### 4. Aftermath and Procedural History

As a result of this incident, Plaintiff was charged with resisting arrest, obstruction of administration of law, criminal mischief, and trespassing in a park after dark. All charges against Plaintiff were dismissed on July 28, 2016. Pl.'s Am. Compl. at ¶ 42.

Plaintiff filed a complaint on April 4, 2017 against Defendant Eliasen, the Borough of Glassboro, and various unknown persons. He subsequently amended his complaint on January 27, 2018, naming as Defendants Eliasen, Viscenglia, the Borough of Glassboro, Robert Highly, and Alex Fanfarillo. Pl.'s Am. Compl. In his Amended Complaint, Plaintiff brings six claims: malicious prosecution (Count I); false arrest (Count II); false imprisonment (Count III); excessive force and assault (Count IV); failure to supervise, train, adopt needed policy (Count V); and failure to intervene (Count VI). While the Amended Complaint does not cite specific statutes for each Count, the Court notes that all of these Counts include analogous federal claims.

Defendants then filed a motion for judgment on the pleadings. *See* Def. Motion for Judgment on the Pleadings ("Defs. First Motion") [Doc. No. 27]. There, Defendants argued that the Court should dismiss "all of Plaintiff's state law claims in the Amended Complaint for failure to satisfy the notice requirements under New Jersey Tort Claims Act." *Id.* at 2. The Court granted this motion in part. *Teel v. Eliasen*, 2018 U.S. Dist. LEXIS 183853, at *4-5, 2018 WL 5307806 (D.N.J. Oct. 26, 2018). Specifically, the Court's Order dismissed the "state claims <u>within</u> Counts 1, 2, 3, 4, and 5." Oct. 26, 2018 Order [Doc. No. 43] (emphasis added). Because Plaintiff's First Motion only focused on the state law claims within Plaintiff's Amended Complaint, the Court's October 26, 2018 Order did not dismiss *any* federal claims asserted.[2]

Defendants filed the instant motion for summary judgment "dismissing the remaining count (Count 6) of Plaintiff Kameron Teel's Amended Complaint." Defs. Motion for Summary Judgment ("Defs. MSJ") [Doc. No. 44]. While all of Plaintiff's federal claims remain, Defendants' Motion for Summary Judgment does not provide any arguments on the other federal claims subsumed within Counts I through V. The Court therefore considers the Motion for Summary Judgment, as the Defendants submit, and focuses only on Count VI, failure to intervene.

## II. LEGAL STANDARD

---

[2] Defendants mistakenly think the First Motion challenged Plaintiff's federal claim. The Court's Order clearly only dismissed state claims within the first five counts. Furthermore, in the papers currently before the Court, Defendants mistakenly assert, "There is only one remaining claim in Plaintiff's Amended Complaint – Count 6 – for alleged Failure to Intervene. . ." Def. Reply Br. [Doc. No. 56] at 1. This is simply incorrect. Defendants seem to misconstrue their previous motion and ignore the fact that they specifically asked the Court to consider only the state law claims within the Amended Complaint. As such, the Motion for Summary Judgment at issue only focuses on one of the six remaining Counts and therefore improperly asks the Court to dismiss the entire case. Put simply, Defendants have a duty to read and consider the motions they submit and certify to the Court. *See* Fed. R. Civ. P. 11.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 Fed. App'x. 353, 354 (3d Cir. 2007) (citation omitted). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the nonmoving party," *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Defendants present several arguments to support their motion. They argue that Defendants are entitled to summary judgment based upon qualified immunity. They also state that the record shows no dispute of material fact as to whether Defendants used excessive force. Finally, they produce an expert report to further argue that Defendants acted reasonably in arresting Plaintiff. Plaintiff, however, argues that the Officers failed to intervene in the use of excessive force. Specifically, Plaintiff claims the Officers choked him and slammed his head into the squad car. The Court considers these arguments in turn.

### 1. Qualified Immunity

The doctrine of qualified immunity shields government officers from civil liability under Section 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ). The analysis has two steps, which courts may decide in either order. *See Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009) (citing *Pearson*, 555 U.S. at 232). At the first step, courts "decide whether the facts ... make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. At the second step, courts "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* If the answer to either question is "no," immunity shields a defendant. *Pitman v. Ottehberg*, No. 10-cv-2538, 2015 WL 6445872, at *6 (D.N.J. Oct. 23, 2015) (citations omitted).

At summary judgment, qualified immunity is a question of law but is precluded by genuine disputes of material fact. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Here,

Sergeant Eliasen and Officer Visceglia are not entitled to summary because there is a question of material fact as to whether a constitutional violation occurred on Count VI. The constitutional violation at issue is the failure to intervene in the use of excessive force.

### 2. Failure to Intervene

A failure to intervene claim is cognizable when an officer "fails or refuses to intervene when a constitutional violation ... takes place in his presence." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). Plaintiff focuses on the constitutional violation of excessive force in his Amended Complaint. Specifically, Plaintiff alleges that each Defendant "had a duty to intervene to prevent the use of excessive force by a fellow officer, each Defendant had a reasonable opportunity to intervene, and each Defendant failed to intervene." Pl. Am. Compl. at ¶ 86. The Court must therefore consider whether there is a question of material fact as to whether Sergeant Eliasen and Officer Visceglia used excessive force against Plaintiff.

Excessive force claims are analyzed under the Fourth Amendment's objective "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Although reasonableness is often a factual question, summary judgment is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citation omitted). In making that determination, courts consider the totality of the circumstances, judged "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015). The calculus must allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

In assessing the totality of the circumstances, courts may consider "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force," not just the facts and circumstances at the "precise moment that excessive force is applied." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). Under *Graham*, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other relevant considerations include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). Courts may also consider whether the "physical force applied was of such an extent as to lead to injury." *Id.*

Here, Plaintiff argues that Sergeant Eliasen and Officer Visceglia used excessive force in choking him and slamming his head against the hood of the police vehicle. The Court finds factual disputes in both instances. Plaintiff first claims he was choked by Defendant Eliasen. Teel Dep. at 84. This use of force query focuses on Sergeant Eliasen's actions while on top of Plaintiff. Plaintiff also states that he "came over and flipped me towards my back, put his knee on my chest, and hands toward my throat." *Id.* at 83. Sergeant Eliasen, however, denies this characterization, and instead swears that he did not choke Plaintiff. He also states that choking a suspect is "never" appropriate. *See* Eliasen Dep. at 70. Still, Sergeant Eliasen admits that he put his hands near "the base of his neck by his chest to gain some type of control . . ." *Id.* Taken collectively, the testimony of the Officers and Plaintiff clearly shows a dispute of material fact.

Plaintiff next claims that Defendants used excessive force in slamming his head into the police vehicle. Pl. Opp'n Br. at 9. Plaintiff states that Defendants pushed him into the squad car. Specifically, he testified that one of the Officers "slammed [him] down on the hood of the vehicle" and again before putting him in the back seat. *Id.* at 120. He then suffered a concussion. *Id.* at 114. Defendants, however, argue that Plaintiff willfully threw himself onto the police vehicle (Def. Br. at 10), and only after asking if the body worn cameras were on. This conflicting testimony clearly shows a fact dispute on the issue of excessive force.

Finally, the Court rejects Defendants' argument that the Body Worn Camera shows no question of material fact as to whether the use of force was reasonable. Body Worn Cameras, much like other evidence presented to a court, may only defeat a Plaintiff's version of events if the video "blatantly contradicts" Plaintiff's version of events. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (holding that if "opposing parties tell two different stories, one of which is blatantly contradicted" or "so utterly discredited" by the record, a court should not adopt the fiction at summary judgment). The video at issue, however, while clear in some instances, does not "blatantly contradict" Plaintiff's version of events that the use of force was excessive. Not only is it unclear whether Sergeant Eliasen choked Plaintiff, but the video also does not clearly show the degree of force he used when he sat on top of Plaintiff. In addition, the body worn camera does not clarify the amount of force used when Plaintiff's head hit the squad car. Because the video is filmed at chest-level, the footage does not provide a clear view of either Officers' lower extremities. Relatedly, following the initial contact with the police car, Officer Visceglia's body worn camera is largely obstructed when he uses his hands to allegedly assist the Plaintiff. As such, the Court is simply unable to determine whether a second contact occurred during this obstructed moment. Again, a question of fact remains for the jury.

Finally, the Court rejects Defendants' attempts to win on summary judgment by producing an expert. As courts elsewhere have explained, the proper inquiry is not whether the incident could have been handled differently, but rather whether the Defendants' conduct violated the Fourth Amendment. *See Lane v. City of Camden*, No. 11-cv-5584, 2015 WL 5603039, at *7 (D.N.J. Sept. 23, 2015) (stating that "a plaintiff cannot defeat summary judgment 'by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless'" and that "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently" (citation omitted)); *McDougald v. Franklin Twp.*, No. 12-cv-3423, 2014 WL 1744772, at *5 (D.N.J. Apr. 30, 2014) (declining to "second-guess whether alternative actions by police officers 'might conceivably have been available'" to avoid a shooting (citation omitted)). This too is a question for the jury to consider.

### IV. CONCLUSION

For the reasons articulated above, Defendants' Motion for Summary Judgment as to Count VI is **DENIED**.

Dated: 7/9/2019                                              s/ Robert B. Kugler

                                                                                                ROBERT B. KUGLER

                                                                                                 United Stated District Judge